SAMUEL A. JACOBS, INDIVIDUALLY AND ON BEHALF OF ALL THOSE SIMILARLY SITUATED, PLAINTIFFS-RESPONDENTS AND CROSS-APPELLANTS, v. GREAT PACIFIC CENTURY CORPORATION, DEFENDANT-APPELLANT AND CROSS-RE-SPONDENT.

Argued September 23, 1986—Decided December 16, 1986.

_Michael R. Griffinger_ argued the cause for defendant-appellant and cross-respondent (_Crummy, Del Deo, Dolan, Griffinger & Vecchione,_ attorneys).

_Bruce H. Nagel_ argued the cause for plaintiffs-respondents and cross-appellants (_Meth, Nagel, Rice, Woehling & Bausch,_ attorneys).

PER CURIAM.

We granted certification, 102 _N.J._ 397 (1986), primarily to consider whether, in the absence of an express contractual provision, the interest earned on a real estate deposit should be considered the property of the seller or buyer. The issue arises in the context of an agreement which specifically requires that

the deposit be held in an interest bearing trust account. We find that the special circumstances of this case do not call for resolution of the general issue.

As Justice Schreiber stated in *Kearny PBA Local No. 21 v. Town of Kearny*, 81 *N.J.* 208, 221 (1979),

> [t]he polestar of construction of a contract is to discover the intention of the parties. * * * * Any number of interpretative devices have been used to discover the parties' intent. These include consideration of the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct. Several of these tools may be available in any given situation—some leading to conflicting results. But the weighing and consideration in the last analysis should lead to what is considered to be the parties' understanding. Individual interpretative rules should be subordinated to that goal. See *Ace Stone, Inc. v. Tp. of Wayne*, 47 *N.J.* 431, 439 (1966), and cases cited. [citations omitted].

Applying those guiding principles here, we conclude that the trial court correctly held, after weighing and considering all the factors relevant to the parties' intent, in light of the parties' understanding of the contract, that the interest on the deposit be credited to the purchaser. In so holding, we do not reach the question of which party ordinarily is to receive credit for the interest earned on a realty deposit, held in trust, in the absence of an express contractual provision.

The facts and circumstances that sustain the result here are as follows. The defendant, Great Pacific Century Corp. (Great Pacific), is the developer and vendor of Century Tower, a 235–unit luxury, cooperative apartment complex in Fort Lee, New Jersey. Plaintiff, Samuel Jacobs, individually and on behalf of class members, is the purchaser of cooperative shares with accompanying proprietary lease.

On October 16, 1980, Jacobs signed a "Stock Purchase Agreement" pursuant to the "Offering Statement and Plan of Cooperative Organization" for the property and placed a deposit on a unit in Century Tower. At closing, he requested that the interest earned on the deposit from date of deposit to date of closing be credited toward the purchase price. Great Pacific refused. Jacobs proceeded with the closing "under protest."

He later instituted a class action suit on behalf of other Century Tower purchasers who were similarly situate in not having the interest earned on their deposits credited toward the purchase prices.

The provisions in the "Stock Purchase Agreement" and "Offering Statement" do not expressly state which party receives credit for interest earned when a sale is completed. Rather, the contract focuses on which party receives interest earned when there is a default or breach by either party. The purchaser obtains the deposit and interest earned if the seller defaults and the seller retains deposit and interest earned if the purchaser defaults. The only "non-default" provision in the "Stock Purchase Agreement" concerning deposit and interest earned thereon provides:

> All monies received by the Seller on account of the Purchase Price shall be deposited in trust in an interest bearing account at Citibank, N.A., under the name "One Century City Special Account", until actually transferred to the Seller in connection with the closing under this Purchase Agreement. Such account will bear interest at the rate paid by Citibank, N.A. from time to time on ordinary deposits, which on the date of this Purchase Agreement is 5¼% per annum. Until such deposit has been made, the Seller shall hold all monies received by its employees or agents in trust.

While these provisions are inconclusive if viewed in isolation, when construed in conjunction with the other contract terms and surrounding circumstances, the understanding of the parties becomes apparent.

Because these real estate cooperative units would be offered for sale in New York, the contract had to contain recitals satisfactory to the New York regulatory authorities. It was, therefore, required that the contract specifically contain reference to a provision of New York law, *N.Y. Gen. Bus. Law* § 352–h,[1] to the effect that the deposit would remain the

---

[1]Specifically, N.Y.Gen.Bus.Law § 352–h provides that: "Whenever * * * any * * * corporation * * * offers or sells securities described in subdivision one of section three hundred fifty-two-e of this article to the public in or from the state of New York, then all monies received in connection therewith, including deposits or advances therefor, shall continue to be the money of the person

property of the purchaser until closing. Furthermore, a relevant New York regulation pertaining to cooperative and condominium offering plans, promulgated under § 352–h, now requires the offeror to "[s]tate * * * whether the deposits will accrue interest * * * and whether the purchaser receives the interest." *N.Y.Admin.Code* tit. 13, § 18.3(p)(2) (1984). Although the parties did not rely upon this regulation, and it is not dispositive, it is nevertheless instructive. The "Stock Purchase Agreement" and "Offering Statement" do not expressly address this point. Therefore, given the statutory setting and regulatory imperative to the offeror-developer to resolve this issue, Great Pacific should have included in the contract a provision stating who received the interest; in its absence, any hardship should fall upon it. *Cf. In re Miller*, 90 *N.J.* 210, 221 (1982) (by drafter's failure to add simple words that he intended *perpetual* interest in royalties, contract construed against drafter).

We focus on the New York provisions dealing with cooperative sales, even if not operative as argued by defendant, and despite the fact that the contract was to be governed in other respects by the laws of New Jersey,[2] because the provisions

making such purchase, deposit or advance, and shall be held in trust by the * * * corporation * * * offering or selling such securities and shall not be commingled with the personal monies or become an asset of the * * * corporation * * * receiving the same * * * and said funds shall remain in trust until actually employed in connection with the consummation of the transaction; and in the event * * * the transaction does not result in the acquisition of the real estate * * * for any reason or reasons, then all moneys so collected less such amounts actually employed in connection with the consummation of the transaction shall be fully returned to the investors. Any provision of any contract or agreement or understanding whether oral or in writing, whereby a person who so purchased such securities waives any provision of this section is absolutely void * * *."

[2]We are also unpersuaded, as was the Appellate Division, 204 *N.J.Super.* 605 (1985), by the plaintiffs' argument for application of New Jersey's securities syndication law, *N.J.S.A.* 49:3–27 to –44, *repealed by L.* 1985, c. 405, § 22, because it is doubtful that the sale of these individual owner-occupied coopera-

reflect circumstances indicative of intent. Sales of cooperative apartments include commercial elements not found in the ordinary real estate transaction, and these elements may have led new residential purchasers reasonably to conclude that the interest earned on the deposit should be theirs since the deposit could not be used by the seller while held in trust. In particular, cooperative transactions may be similar to options because, as here, the "Offering Statement" specifically recites that the cooperative seller is not required to close on any of the units unless 60% of all the units are subscribed or the seller elects to put the cooperative plan into effect after 35% of the units are under contract. Hence, special concern must be shown when a purchase agreement for a residential unit purchase is contingent, in a speculative sense, upon the number of sales to other cooperative purchasers or the sponsor's willingness to proceed with the cooperative conversion. It is for this reason that New York cooperative law prohibits deposits and interest earned thereon from being used as working capital. *N.Y. Gen. Bus. Law* § 352–h.

While not emphasized by the parties, there is a difference between the "Offering Statement" and "Purchase Agreement" as to the use of the deposits by the seller. In the "Offering Statement," the relevant provision, and the one inserted pursuant to the New York statute, states that

[n]o monies paid by purchasers will be employed in connection with the consummation of this Plan prior to the Closing [between the sponsor and Apartment Corporation] * * *.

The "Purchase Agreement," however, states that

[a]ll monies received by the Seller * * * shall be deposited in trust in an interest bearing account * * * until actually transferred to the Seller in connection with

tive apartments was a real estate syndication security offering under that law. *Maplewood Village Tenants Ass'n v. Maplewood Village,* 116 *N.J.Super.* 372, 378–80 (Ch.Div.1971); *cf. AMR Realty Co. v. State of New Jersey,* 149 *N.J.Super.* 329 (App.Div.1977) (shares in housing cooperative not securities under Uniform Securities Law). Therefore, *N.J.S.A.* 49:3–27 to –44 is not controlling and we decline to dispose of the matter on the basis of that law.

the closing under this Purchase Agreement [when the purchaser enters into the leasehold relationship with the Apartment Corporation].

This difference as to when monies could be released to the seller may be important to the understanding of the agreements by differing class members. Some class members entered agreements pursuant to the "Offering Statement" only, at a time prior to the sponsor's election to effectuate the cooperative plan; others may have entered agreements after the sponsor declared the plan effective on October 12, 1979, *see* "First Amendment to Offering Statement," but before the actual closing of the plan on October 29, 1979, *see* "Second Amendment to Offering Statement;" still other members, like Jacobs, entered agreements after the cooperative plan was effective and closed. Consequently, and especially for those purchasers who tendered deposits between October 12 and 29, it may have been confusing and ambiguous as to when their deposits could be used by the seller: Was it after the cooperative plan closing between the Sponsor and Apartment Corporation, or was it after the retail closing under the "Purchase Agreement"? Hence, even if the plan had already closed, so as to make the "Offering Statement" provision on the use of deposits inoperative, this distinction would be ambiguous to residential purchasers. The disposition below made no distinction between the classes of purchasers and we do not undertake here to make one.

As always, in the quest for the intention of the parties to the contract, the "attending circumstances, including practices and custom, may serve to clarify the common intention of the parties." *Medivox Prods., Inc. v. Hoffmann-LaRoche, Inc.,* 107 *N.J.Super.* 47, 61 (Law Div.1969) (Handler, J.), citing *Ace Stone, Inc. v. Township of Wayne, supra,* 47 *N.J.* 431. But the judicial interpretative function is to consider what was written, in the entire context of the circumstances under which it was written, and to accord the language a rational meaning in keeping with the expressed general purpose. *Casriel v. King,*

2 *N.J.* 45, 51 (1949); *Nitta v. Yamamoto,* 31 *N.J.Super.* 578, 580 (App.Div.1954).

In its decision, reported at 197 *N.J.Super.* 378 (1984), the trial court, in the exercise of the judicial interpretative function, essentially concluded that the meaning of the critical phrase, in the context of this contract, was that the purchaser was to receive credit at the closing for the deposit and interest earned on the deposit. In reaching its decision, the trial court declined to accept as controlling the unrebutted testimony of defendant's real estate expert that the prevailing custom and usage in New Jersey real estate transactions is to the contrary. The expert witness had testified that if there is interest to be paid on the deposit and the contract is silent, it would follow the deposit. His conclusion was based upon consideration of the principles of equitable conversion and the recognition that the seller had "kept the property off the market."

On this record, given the attendant circumstances, the expressed reference to the statute that the deposit remains the property of the purchaser, the unusual nature of the transaction partaking both of the sale of securities and of the sale of real estate, the express provision that the deposit be placed in an interest-bearing account with a specific institution at a specific rate, and the adverse implication arising from Great Pacific's failure to have stated who was to receive the interest earned, we conclude that the factual finding by the trial court should be sustained.[3]

---

[3]In a reported decision, 204 *N.J.Super.* 605 (1985), the Appellate Division affirmed the judgment of the trial court, but disagreed with the trial court's conclusion that the New York law "deems the purchaser the owner of the deposit for all purposes." *Id.* at 608. Considering the six specific provisions for disposition of the interest, and the other relevant provisions, the Appellate Division viewed the deposit as a pledge to secure performance by the purchaser. *Id.* at 609. Under that analysis, "[i]f the purchaser closes, * * * the seller must return the deposit and its interest to the purchaser in the form of a credit against the purchase price." *Id.* at 610.

In doing so, we decline to resolve the general question of whether, in the ordinary residential real estate transaction in New Jersey, the deposit is regarded as a pledge to guarantee future performance by the purchaser or whether, as Great Pacific's expert testified, it is commonly understood in New Jersey that the deposit constitutes advance payment of the purchase price with the interest on that deposit, from the time of the deposit until closing, the property of the seller unless the closing does not take place for reasons set forth in the contract, thereby requiring return of the deposit, and any interest that was to be earned thereon, to the purchaser.

We suggest that in almost all circumstances prudent counsel should provide for this contingency in the preparation and execution of real estate contracts.

We further leave undisturbed, for the reasons stated by the courts below, their dispositions of the appropriateness of class certification as well as plaintiffs' application for treble damages and counsel fees.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.